United States v. Voustianiouk

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2011

(Submitted: November 7, 2011                                   Decided: July 12, 2012)

Docket No. 10-4420

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

ANDREI VOUSTIANIOUK,

*Defendant-Appellant*.

_____

Before: McLAUGHLIN, POOLER, and PARKER, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Southern District of New York (Patterson, *J.*) convicting Andrei Voustianiouk of possession and receipt of child pornography following a bench trial.  Because evidence against Voustianiouk was seized as a result of a search that violated the Fourth Amendment of the U.S. Constitution, and because we conclude that the exclusionary rule requires that the evidence seized be suppressed, we reverse the district court's denial of Voustianiouk's motion to suppress the evidence, vacate his conviction and sentence, and remand the case for further proceedings consistent with this opinion.

Reversed in part, vacated, and remanded.

KERRY A. LAWRENCE (of counsel), Briccetti, Calhoun & Lawrence, LLP, White Plains, N.Y., *for Defendant-Appellant Andrei Voustianiouk*.

JANIS M. ECHENBERG & JUSTIN S. WEDDLE, Assistant United States Attorneys (of counsel), *for* Preet Bharara, United States Attorney for the Southern District of New York, *for Appellee*.

POOLER, *Circuit Judge*:

Federal agents arrived at a small two-story building in New York City one morning in January 2009 with a warrant to search the first-floor apartment. The warrant did not mention the name of the person who lived there and only authorized them to search that single apartment. But on the morning of the search the agents discovered that the suspect they were investigating lived on the second floor, not the first. He also happened to be home. So they decided to search his apartment instead.

The officials could have called a magistrate judge and obtained a new warrant to search the second-floor apartment. The evidence wasn't going anywhere, and neither was their suspect. But the officials took a shortcut. They searched the second floor without first obtaining a warrant from a judge.

The officials in this case did not stray far from their search warrant. They merely ventured up a flight of stairs. But the Fourth Amendment does not permit the police to search one apartment simply because they have a warrant to search another that is nearby.

We hold that these agents conducted a warrantless search of a person's home in violation of the Fourth Amendment. In addition, we conclude that the evidence seized as a result of this unconstitutional search should have been suppressed because the officials in this case knowingly

2

stepped beyond the bounds of the search that the magistrate judge had authorized them to conduct. Accordingly, we reverse the district court's denial of Voustianiouk's motion to suppress the evidence, vacate his conviction and sentence, and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

In 2008, an American official with U.S. Immigration and Customs Enforcement obtained a report from the German federal police indicating that someone who had accessed a file-sharing network using a particular Internet Protocol ("IP") address, which is a short string of numbers that can be used to identify individual computers, had a file on their computer containing child pornography.

American law enforcement officials traced the IP address to an Internet service provider, and filed a subpoena with the service provider's parent company requesting the name and address of the customer whose account was associated with the IP address under investigation. According to the Internet service provider, "the IP address was assigned to Andrei Voustianiouk, at 2424 Cambreleng Avenue, Apartment 1, Bronx, New York."

Prior to applying for a search warrant, Robert Raab, a federal agent involved with the investigation, visited the building at 2424 Cambreleng Avenue and visually "observ[ed] . . . [its] exterior." Raab attempted to confirm the accuracy of Voustianiouk's address by checking with the United States Postal Service, as well as with a database maintained by New York State that contained the names and addresses of people who had registered for driver's licenses. Both sources of information confirmed that Voustianiouk lived at 2424 Cambreleng Avenue. But

3

neither the postal service nor the New York State database indicated which apartment was Voustianiouk's.

Raab eventually obtained a search warrant authorizing agents to search "the premises known and described as 2424 Cambreleng Avenue Apt. 1, Bronx, New York 10458." (capitalization altered). In an affidavit submitted to the magistrate judge in support of the search warrant, Raab identified the place to be searched as "a ground floor apartment inside a two-story white shingled house." Raab's affidavit indicated that "[b]ased in part on information obtained through a summons directed to the internet service provider for [the] IP address" under investigation, he learned "the subscriber . . . was an individual at 2424 Cambreleng Avenue, Apt. 1, Bronx, New York, 10458."

Neither the search warrant nor any of the accompanying information—which comprised a total of twenty-four pages— mentions Voustianiouk's name. In fact, the government intentionally withheld Voustianiouk's name from the magistrate judge who approved the search warrant. When asked by the district court below why Voustianiouk's name was not mentioned in the warrant or its accompanying materials, an Assistant United States Attorney prosecuting the case explained: "There are cases, your Honor, where there are multiple people in a home and one person may be the person whose information is on the subscription for the Internet address, so it doesn't always make sense to name that person because going in you don't know if that's necessarily the person that you are going after . . . ."

Thus, there is no indication that the magistrate judge who issued the search warrant was aware that the government even considered Voustianiouk a suspect, or knew what evidence the government had to support its suspicions.

4

Just over a week after obtaining a search warrant, Raab and other agents arrived at 2424 Cambreleng Avenue on the morning of January 22, 2009. As Raab later explained, they "rang both of the buzzers because neither were marked with an apartment number." After the officials rang the doorbells, they "saw a light turn on from the second floor window and then a man came to the front door of" the building. Raab Affirmation 6. The man was asked whether "he was Andrei Voustianiouk[,] and he confirmed that he was."

Raab also immediately recognized Voustianiouk from a photograph that Raab had seen on the Internet. Voustianiouk worked as a medical researcher at the New York University Medical Center, and Raab had found "a picture of the staff" from what he "believe[d] [was] the NYU Medical Center website."

At that point, Raab and the other officials "showed the defendant that [they] had a search warrant and needed to enter his apartment." "Voustianiouk then led [them] up the stairs and into his apartment on the second floor."

There is no indication that the officials explained that the search warrant in their possession did not mention Voustianiouk's name or that the warrant clearly made reference to the downstairs apartment, not the one that he was leading them to on the second floor.

Upon searching the apartment, officials discovered thousands of files containing child pornography on computers and hard drives. Voustianiouk apparently had been downloading child pornography from the Internet for some time. He eventually admitted to "viewing child pornography for over one year at the time" agents searched his home. Voustianiouk was charged with receipt and possession of child pornography in violation of federal law, and was found guilty after a bench trial before Judge Robert P. Patterson, Jr., of the Southern District of New York.

5

In September 2010, Judge Patterson sentenced Voustianiouk to a five-year term in prison, which was the mandatory minimum sentence that had been set by Congress for the criminal conduct at issue. Voustianiouk is currently serving that sentence and is scheduled to be released from prison in March 2015. *See* Inmate Locator, Federal Bureau of Prisons, http://www.bop.gov/iloc2/LocateInmate.jsp (indicating that Voustianiouk's release date is March 20, 2015).

On appeal, Voustianiouk argues that the search of his apartment violated the Fourth Amendment of the U.S. Constitution and that the government should have been prohibited from introducing the evidence that was seized as a result of that search at the trial against him. We agree.

## DISCUSSION

"The standard of review for evaluating the district court's ruling on a suppression motion is clear error as to the district court's factual findings, viewing the evidence in the light most favorable to the government, and *de novo* as to questions of law." *United States v. Rodriguez*, 356 F.3d 254, 257 (2d Cir. 2004).

## I

The Fourth Amendment of the U.S. Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The Fourth Amendment's requirements regarding search warrants are not "formalities." *McDonald v. United States*, 335 U.S. 451, 455 (1948). By requiring police officers first to obtain a warrant before they search a person's home, unless some exception applies that permits a warrantless search, "the Fourth Amendment has interposed a magistrate between the citizen and the police," "not to shield criminals nor to make the home a safe haven for illegal activities," but rather to ensure "that an objective mind might weigh the need to invade that privacy in order to enforce the law." *Id.*

Indeed, the Fourth Amendment's demand that search warrants "particularly describ[e] the place to be searched," U.S. Const. amend. IV, provides a "limitation curtailing the officers' discretion when executing the warrant," so that "the safeguard of having a magistrate determine the scope of the search is [not] lost." *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992); *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (noting that the Fourth Amendment's particularity "requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit"). It is long-established that "[i]t is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." *Steele v. United States*, 267 U.S. 498, 503 (1925).

In determining the permissible scope of a search that has been authorized by a search warrant, however, we must look to the place that the magistrate judge who issued the warrant intended to be searched, not to the place that the police intended to search when they applied for the warrant. *See Groh v. Ramirez*, 540 U.S. 551, 561 (2004) ("The mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope of the search should be as broad as the affiant's request."); *Ybarra v. Illinois*, 444 U.S. 85, 90 n.2 (1979) ("Had the

issuing judge intended that the warrant would or could authorize a search of every person found within the tavern, he would hardly have specifically authorized the search of 'Greg' alone."); 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.5 (4th ed. 2004) ("One of the specific commands of the Fourth Amendment is that no warrants shall issue except those 'particularly describing the place to be searched.' Quite obviously, the primary purpose of this limitation is to minimize the risk that officers executing search warrants will by mistake search a place other than the place *intended by the magistrate*." (emphasis added)).

We conclude that these agents searched an apartment other than the one that the magistrate intended to authorize them to search. Indeed, we have no reason to believe that the magistrate judge who signed the warrant at issue intended for the scope of the search to cover any apartment in the building other than the one on the first floor. The search warrant and accompanying affidavit explicitly authorize the search of the first-floor apartment and make no mention of the second-floor apartment or even of Voustianiouk's name. The government concedes as much on appeal, acknowledging that "Agent Raab did not disclose Voustianiouk's name to the judge who issued the warrant." Indeed, the affidavit submitted by Raab in support of his application for a search warrant would not have provided probable cause to search Voustianiouk's apartment on the second floor, because the information in the affidavit, by omitting any mention of Voustianiouk, does not provide any basis for concluding that he may have been involved in a crime.

We note that when officers search a location other than the one that the magistrate judge intended to be searched, as was the case here, there is no need to inquire into whether the warrant's description was sufficiently particular to satisfy the Fourth Amendment in order to determine if the search violated the Constitution, because the search was conducted without the

8

authorization of a warrant.[1]  Such a warrantless search, absent some exception, violates the

Fourth Amendment not because the description in the warrant was insufficient or inaccurate, but

rather because the agents executing the search exceeded the authority that they had been granted

by the magistrate judge.  *See Horton v. California*, 496 U.S. 128, 140 (1990) ("If the scope of a

search exceeds that permitted by the terms of a validly issued warrant or the character of the

relevant exception from the warrant requirement, the subsequent seizure is unconstitutional

without more.").

Accordingly, we need not and do not address whether a warrant that authorizes the search

of a particular person's apartment, but mistakenly lists an incorrect apartment number, would

satisfy the particularity requirement of the Fourth Amendment.  We note only that if

Voustianiouk had not been home or had not answered the building's front door on the morning

of the search, the agents might very well have entered and searched the first-floor apartment,

which we have no reason to believe was anything other than an innocent person's home.

"Courts of Appeals have rejected Fourth Amendment challenges to warrants that contain partial

misdescriptions of the place to be searched so long as the officer executing the warrant could

'ascertain and identify the target of the search *with no reasonable probability of searching

another premises in error.*'"  *Velardi v. Walsh*, 40 F.3d 569, 576 (2d Cir. 1994) (quoting *United

States v. Valentine*, 984 F.2d 906, 909 (8th Cir. 1993)));  *see also United States v. Bonner*, 808

F.2d 864, 866 (1st Cir. 1986) ("The test for determining the adequacy of the description of the

location to be searched is whether the description is sufficient 'to enable the executing officer to

---

[1] Of course, when agents search a location other than the one a magistrate judge intended
for them to search, the warrant's description may still be important for the purpose of
determining whether the agents reasonably relied on the description in conducting a search and
thus whether the exclusionary rule should be applied.  *See infra* Part II.

locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched.'" (quoting *United States v. Turner*, 770 F.2d 1508, 1510 (9th Cir. 1985))).

The government correctly argues on appeal that inaccuracies or ambiguities in a warrant do not necessarily render a warrant invalid under the Fourth Amendment. *See United States v. Williams*, 69 F. App'x 494, 496 (2d Cir. 2003) (summary order) ("[T]he officers who executed the warrant were familiar with the apartment because they had purchased drugs there through a confidential informant shortly before the warrant was executed. They had surveilled the informant entering that apartment through the brown side entrance door specified in the warrant. Accordingly, there was no risk that the executing officers would use any other door or mistakenly enter the wrong apartment."); *United States v. Campanile*, 516 F.2d 288, 291 (2d Cir. 1975) (noting that while one of the appellants, "[a]t oral argument, . . . made much of the statement in the warrant that it was for the 'only basement' apartment at the . . . address [at issue], although the evidence at trial indicated that there may have been two basement apartments," "the police searched only the apartment lived in by [the] defendant's brother, which was the one described in the affidavit that supported the warrant"); *Valentine*, 984 F.2d at 908 (upholding the validity of a search warrant where "[o]fficers obtained the warrant after surveillance, over the course of several days, of [a particular] unnumbered building," and "[t]he warrant accurately described the target building," even though the warrant "inaccurately identified the [building's] number"); *United States v. Gordon*, 901 F.2d 48, 50 (5th Cir. 1990) (noting that the government agent "searched only the location intended to be searched—the residence he had seen with the undercover officer," and concluding that "[b]ecause [the agent] was both the affiant and the executing officer and had recently viewed the location in question,

there was no possibility the wrong premises would be searched." (internal quotation marks omitted)). But the warrant at issue here did not inaccurately or incompletely describe the place that the magistrate judge had authorized the agents to search. If anything, the warrant was quite clear and specific. Raab believed that the IP address linked to child pornography was associated with a computer located in the apartment on the ground floor of the building, and he secured a warrant to search that particular apartment.

The government essentially admitted to purposefully omitting Voustianiouk's name from the search warrant and accompanying affidavit because the government did not want to foreclose the possibility that it could search the first-floor apartment even if it turned out that Voustianiouk did not in fact live there. Agents had obtained information from an Internet service provider that suggested that a computer located in that apartment contained child pornography. And for all they knew, Voustianiouk might have been a landlord who paid the Internet bill on behalf of a tenant.

Indeed, if the officers had discovered on the morning of the search that Voustianiouk formerly lived in the first-floor apartment but had moved out a few years ago, and that the current resident in that apartment had simply continued to pay for Internet service but had neglected to change the account holder's name, the officers would still have had every reason to search the first-floor apartment, and would have had a valid warrant to do so, notwithstanding the fact that Voustianiouk lived elsewhere.

By purposefully excluding any mention of Voustianiouk's name from the warrant and affidavit, the government also deprived the magistrate judge of any opportunity to assess whether there was evidence to support a search of Voustianiouk's home, if indeed that home turned out to be located somewhere other than the first floor. There is no indication that the

11

officials involved explained to the magistrate judge who signed the search warrant that a man named Andrei Voustianiouk was in any way connected with the investigation.

Instead, Raab merely stated in his affidavit that he had determined, "[b]ased in part on information obtained through a summons directed to the internet service provider for [the] IP address" in question, that "the subscriber [for that] IP address . . . was an individual at 2424 Cambreleng Avenue, Apt. 1, Bronx, New York, 10458." If anything, Raab's affidavit seems to acknowledge the possibility that Voustianiouk might not be involved in the crime at all. ("In order to ascertain the identity of who controls the PREMISES and any evidence found therein, leases, rental agreements, contracts, mortgages, and other documents indicating ownership, possession, and/or control of the PREMISES also would be important evidence in this case.").

To be sure, the officers in this case may have had solid evidence linking Voustianiouk to a crime and thus had reason to search his apartment even if it happened to be on the second floor. But they never provided the magistrate judge with an opportunity to evaluate the reliability of that evidence. In this case, the information that prompted police to suspect Voustianiouk may have committed a crime happened to come from a reliable source—indeed, Voustianiouk's own name was on the Internet account under investigation.

The Supreme Court, however, has made clear that the mere fact that officials were in possession of evidence that *would have* provided probable cause for the search that they ultimately conducted is irrelevant in determining whether a search violated the Fourth Amendment of the Constitution. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971) ("Under the cases of this Court, an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate." (citing *Aguilar v. Texas*, 378 U.S. 108, 109

12

n.1 (1964))); *see also Aguilar*, 378 U.S. at 109 n.1 ("It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention.").

Therefore, we hold that when the magistrate judge granted the search warrant at issue in this case, he only intended to authorize, and thus did authorize, a search of the first-floor apartment at 2424 Cambreleng Avenue. Indeed, that was the only apartment that the magistrate judge could have validly authorized police officers to search because the sworn affidavit submitted by Raab did not provide probable cause to search any other place. Consequently, when the officials entered the apartment on the second floor, they conducted a warrantless search in violation of the Fourth Amendment.[2]

## II

Even though we conclude that the officers in this case violated the Fourth Amendment by conducting a warrantless search of Voustianiouk's home, we must still decide whether the evidence that was seized as a result of that unconstitutional search must be suppressed.

In order "to safeguard Fourth Amendment rights," *Herring v. United States*, 555 U.S. 135, 139-40 (2009) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)), the Supreme Court has created "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial," *Herring*, 555 U.S. at 139 (citing *Weeks v. United States*, 232 U.S. 383, 398 (1914)).

---

[2] We note that the government does not argue that Voustianiouk consented to the search of his apartment or otherwise assert that any exception to the general requirement that officials first obtain a warrant before conducting a search of a home applies in this case.

13

"The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring*, 555 U.S. at 140 (citing *Illinois v. Gates*, 462 U.S. 213, 223 (1983)). "[T]he exclusionary rule is designed to deter police misconduct," *United States v. Leon*, 468 U.S. 897, 916 (1984), and the Supreme Court has held that when the police act "in objectively reasonable reliance on a . . . search warrant," even if the warrant was issued in violation of the Fourth Amendment, "the marginal or nonexistent benefits produced by suppressing evidence obtained" as a result of that "subsequently invalidated search warrant cannot justify the substantial costs of exclusion," *id.* at 922. "The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance." *George*, 975 F.2d at 77.

We are unable to conclude that the officers in this case reasonably relied on the warrant in their possession—which on its face explicitly authorized the search of the first-floor apartment—to conduct a search of the apartment on the second floor. Indeed, there can be no doubt that a search warrant for one apartment in a building does not permit the police to enter apartments other than the one specified in their warrant. *See Garrison*, 480 U.S. at 86 ("If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to McWebb's apartment."); *see also Leon*, 468 U.S. at 919 n.20 ("The objective standard we adopt . . . requires officers to have a reasonable knowledge of what the law prohibits.").

Nothing in the warrant or accompanying affidavit provided any reason for these officers to conclude that the magistrate judge had authorized them to search the building's second floor. Neither the warrant nor the affidavit mentioned Voustianiouk as the occupant of the apartment

14

that officials were authorized to search. *See United States v. Woodbury*, 511 F.3d 93, 100 (1st Cir. 2007) (applying the good-faith exception to the exclusionary rule in a case where even "[t]hough [the warrant] list[ed] the wrong unit, the warrant made clear reference to the apartment occupied by" the defendant); *United States v. Owens*, 848 F.2d 462, 463 (4th Cir. 1988) (applying the good-faith exception to the exclusionary rule where "[t]he affidavit supporting this search warrant set forth facts which supported a probable cause finding . . . that Owens . . . exercised control over this apartment"); *cf. Velardi*, 40 F.3d at 576 (holding that officers were entitled to qualified immunity when they conducted an "entry and emergency sweep" of the third house on a particular road even though the warrant specified the fourth house while noting that the warrant specifically mentioned the name of the house's occupant); *see also United States v. Clark*, 638 F.3d 89, 102 n.12 (2d Cir. 2011) ("In addressing the objective reasonableness of defendants' reliance on the invalidated warrant for purposes of qualified immunity, the Supreme Court observed that the standard tracked that applicable to determining good faith reliance under *Leon*." (citing *Groh*, 540 U.S. at 565 n.8)).

We are well aware that "exclusion has always been our last resort, not our first impulse." *Herring*, 555 U.S. at 140 (internal quotation marks omitted). But these officers did not stumble into the second-floor apartment by accident. And they did not mistakenly find themselves in a part of the building that the warrant did not authorize them to search. Rather, these officers knowingly ventured beyond the clear confines of their warrant by walking up a flight of stairs and into the second-floor apartment. *Cf. Garrison*, 480 U.S. at 88 ("Prior to the officers' discovery of the factual mistake, they perceived McWebb's apartment and the third-floor premises as one and the same; therefore their execution of the warrant reasonably included the entire third floor."). In addition, the government deliberately withheld information from the

15

magistrate judge who granted the warrant in an attempt to ensure that officials would be permitted to search the first-floor apartment whether or not Voustianiouk turned out to have been the one to have used the computer they were hoping to find. In our view, this "conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144.

Furthermore, the officials in this case, unlike those in *Massachusetts v. Sheppard*, 468 U.S. 981 (1984), did not take "every step that could reasonably be expected of them." *Id.* at 989. When the officials here rang the doorbells that morning at 2424 Cambreleng Avenue, and discovered that Voustianiouk lived on the second floor instead of the first, they could have obtained a warrant to search Voustianiouk's second-floor home instead of deciding, without any judicial oversight, that the evidence in their possession provided probable cause to do so. *Cf. Velardi*, 40 F.3d at 576 (holding that "[n]o jury could reasonably fail to find . . . that it was objectively reasonable for the officers to take the actions they did" when "the only invasion of privacy that occurred . . . was entry and an emergency sweep; a search of the premises was not conducted until the magistrate, informed of what the officers had learned on the scene prior to entry, explicitly authorized a search of the third house").

There is no question that the officers in this case could have called a magistrate judge on the telephone that very morning to obtain a new search warrant for the second-floor apartment. *See* Fed. R. Crim. P. 41(d)(3) ("[A] magistrate judge may issue a warrant based on information communicated by telephone or other reliable electronic means."); *see also United States v. Turner*, 558 F.2d 46, 50 (2d Cir. 1977) ("The Fourth Amendment is sufficiently flexible to account for such technological advances.").

16

And we have little doubt that Raab and the other officers involved could have detained Voustianiouk outside his apartment while they obtained a new warrant to search his home on the second floor. *See Illinois v. McArthur*, 531 U.S. 326, 328 (2001) (holding that the Fourth Amendment was not violated when "[p]olice officers, with probable cause to believe that a man had hidden marijuana in his home, prevented that man from entering the home for about two hours while they obtained a search warrant").

Indeed, while courts must sometimes "allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants," *Garrison*, 480 U.S. at 87, the Supreme Court has explicitly rejected the need for such deference when, as was the case here, no "sort of exigency existed when [an official] drafted the affidavit, the warrant application, and the warrant, or when he conducted the search," *Groh*, 540 U.S. at 565 n.9. These officers had ample opportunity to detain their suspect and obtain a new warrant. Indeed, Voustianiouk was standing at the front door of his building in a bathrobe.

We do not doubt that the officers involved in this case were well-meaning: they were trying to catch a criminal. But simply because they were trying to do the right thing does not mean that they reasonably concluded that the warrant in their possession authorized the search they conducted. *See Illinois v. Krull*, 480 U.S. 340, 355 (1987) ("As we emphasized in *Leon*, the standard of reasonableness we adopt is an objective one; the standard does not turn on the subjective good faith of individual officers." (citing *Leon*, 468 U.S. at 919 n.20)).

Furthermore, we note that these officers firmly, and perhaps even fervently, believed that they might find evidence of a crime in the second-floor apartment. Indeed, their instincts proved to be correct. However, the Fourth Amendment's general rule that the government first obtain a warrant before searching a person's home does not hinge on the strength of an officer's

17

conviction that evidence of a crime will be uncovered. "Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." *Johnson v. United States*, 333 U.S. 10, 14 (1948).

Accordingly, given the specific facts of this case, we conclude that the evidence seized as a result of this unconstitutional search must be suppressed in order "to deter police misconduct in these circumstances." *Davis v. United States*, 131 S. Ct. 2419, 2423 (2011). Indeed, we believe that suppression is necessary in this case "to compel respect for the constitutional guaranty." *Id.* at 2426 (quoting *Elkins v. United States*, 264 U.S. 206, 217 (1960)) (internal quotation marks omitted).

For the foregoing reasons, we REVERSE the district court's order denying Voustianiouk's motion to suppress the evidence, VACATE his conviction and sentence, and REMAND the case for further proceedings consistent with this opinion.

18