******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* GAVIN LYONS
# STATE OF CONNECTICUT *v.* DAVID GORDON
# STATE OF CONNECTICUT *v.* PRINCE GORDON
# STATE OF CONNECTICUT *v.* ZIPPORAH GREENE-WALTERS
## (AC 42807)

Bright, C. J., and Lavine and Cradle, Js.*

*Syllabus*

Following the search of a home located at 351 Noble Avenue in Bridgeport, the defendants, who all claimed to be residents of that address, were charged with various drug and weapons offenses. The warrant that supposedly authorized the search described the premises to be searched as "349 Noble Avenue." 349 Noble Avenue and 351 Noble Avenue are separate units within the same duplex. Each unit has its own driveway, front entrance, mailbox, electric meter, and gas meter, and neither unit can be accessed from inside of the other unit. Prior to trial, the defendants filed motions to suppress the evidence seized during the search, claiming that, because the warrant authorized a search of the property identified as "349 Noble Avenue," the search of 351 Noble Avenue was conducted without a warrant and that the seizure of the items could not be justified pursuant to any exception to the warrant requirement. Following a hearing, the trial court granted the defendants' motions and, on the state's motion, rendered judgment dismissing each information. The state, on the granting of permission, appealed to this court, claiming, inter alia, that the defendant in the first case, L, who was the only defendant who did not testify at the hearing, failed to meet his burden of proving an expectation of privacy in the area searched and, therefore, did not have standing to proceed with his motion. *Held:*

1. The trial court did not err in determining that L met his burden of proving an expectation of privacy in the area searched by law enforcement officers and had standing to proceed with a motion to suppress: it is well established that owners, tenants, and even overnight guests of a dwelling have a reasonable expectation of privacy in that dwelling and, therefore, have standing to contest the legality of a search of the dwelling; moreover, the state's claims that the court relied on inadmissible hearsay and improperly took judicial notice of facts not testified to at the hearing in determining that L had a reasonable expectation of privacy are unavailing because the state failed to include an adequate analysis of how it was harmed by the court's evidentiary rulings in its brief; furthermore, the court's finding that L had a reasonable expectation of privacy in the area searched was not clearly erroneous when the executing officers found personal items, including men's clothing and important documents such as a passport and other identifications containing L's name or photograph, in the room he alleged was his own and when he was wearing a bathrobe and slippers at the time of the search, which commenced at 6 a.m., evidence that was sufficient to prove that L was, at a minimum, an overnight guest at the premises.

2. The trial court did not err in granting the defendants' motions to suppress: the search was conducted pursuant to a warrant that authorized the search of a different address, the only description of the premises in the warrant was the address, which clearly and unambiguously identified the place to be searched as "349 Noble Avenue," and the warrant did not contain any information indicating that the issuing magistrate instead intended 351 Noble Avenue to be searched or that the officers executing the warrant otherwise had knowledge of that intent; moreover, the mistake in the warrant was not cured by the affidavit filed in support of the warrant application because the warrant did not incorporate the contents of the affidavit, as it did not reference the affidavit, there was no evidence that the affidavit was attached to the warrant, and the affidavit was under seal and was not available to the executing officers, so it could not have been used to inform the officers that the warrant was actually intended to authorize a search of 351 Noble Avenue; further-

more, there are no facts in evidence to uphold the search in the face of the claim that the warrant lacked particularity because there was no evidence that the executing officers prepared the warrant or participated in the surveillance of the premises prior to the search and, therefore, understood the intended reach of the warrant and executed it accordingly; additionally, none of the factors that may justify a search with a technical error in the warrant was present in this case, as there was nothing on the face of the warrant to eliminate the possibility that another premises might be mistakenly searched, such as a physical description of the property, and there was no evidence that the executing officers conducted the presearch investigation or prepared the warrant application; accordingly, the search was a warrantless search that was presumptively unlawful and the state, relying entirely on the warrant as legal authorization for the search, did not claim any exception to the warrant requirement.

Argued October 7, 2020—officially released March 30, 2021

*Procedural History*

Information charging the defendant in the first case with the crimes of theft of a firearm and possession of a controlled substance, and information charging the defendant in the second case with the crimes of sale of a controlled substance, operation of a drug factory, possession of a controlled substance, negligent storage of a firearm, possession of a controlled substance within 1500 feet of a school and possession of drug paraphernalia within 1500 feet of a school, and information charging the defendant in the third case with the crimes of sale of a controlled substance, possession of a controlled substance and possession of drug paraphernalia, and information charging the defendant in the fourth case with the crimes of sale of a controlled substance and possession of a controlled substance, brought to the Superior Court in the judicial district of Fairfield, geographical area number two, where the trial court, *Hon. William Holden*, judge trial referee, granted the defendants' motions to suppress certain evidence and, on the state's motion, rendered judgment dismissing each information; thereafter, the state, on the granting of permission, appealed to this court. *Affirmed.*

*Ronald G. Weller*, senior assistant state's attorney, with whom were *C. Robert Satti, Jr.*, supervisory assistant state's attorney, and, on the brief, *John C. Smriga*, state's attorney, for the appellant (state).

*Adele V. Patterson*, senior assistant public defender, for the appellee (defendant Gavin Lyons).

*Naomi T. Fetterman*, for the appellees (defendant David Gordon et al.).

*Opinion*

BRIGHT, C. J. The state of Connecticut appeals from the judgments of the trial court dismissing informations brought against the defendants, Gavin Lyons, David Gordon, Prince Gordon and Zipporah Greene-Walters, following its granting of motions to suppress filed by the defendants.[1] On appeal, the state claims that the court improperly (1) determined that Lyons met his burden of proving an expectation of privacy in the areas searched by law enforcement agents and, thus, allowed Lyons to proceed with his motion to suppress,[2] and (2) granted the defendants' motions to suppress items seized during a search of a residence located at 351 Noble Avenue in Bridgeport. We affirm the judgments of the trial court.

The following factual and procedural history is relevant to our resolution of the claims on appeal. On January 31, 2017, a United States magistrate signed a federal search and seizure warrant that authorized the search of 349 Noble Avenue, in Bridgeport, which is one half of a multifamily residence. Specifically, the building at the premises is a duplex, with 349 being designated as the premises on the left when facing it from the street and 351 being the premises on the right. On February 1, 2017, state and federal law enforcement agents executed the search warrant at approximately 6 a.m. and entered through the rear of 351 Noble Avenue instead of 349 Noble Avenue, which was the address authorized by the warrant. The search of 351 Noble Avenue revealed the presence of controlled substances and weapons, for which the defendants, who were inside 351 Noble Avenue at the time of the search and claim to be residents of that premises, were arrested and charged with various offenses.[3]

Thereafter, the defendants filed motions to suppress the evidence seized from 351 Noble Avenue. They claimed, inter alia, that because the search warrant issued by the federal magistrate authorized a search of the property identified as 349 Noble Avenue, the search of 351 Noble Avenue was conducted without a warrant and the seizure of items therein could not be justified pursuant to any exception to the warrant requirement. A hearing was held on the motions to suppress on July 23, 2018.

In its memorandum of decision granting the motions to suppress, the court found "the following facts based upon testimonial and documentary evidence. During the suppression hearing, the court received the testimony of Detective Ryan Slaiby, David Gordon, Prince Gordon, Zipporah Greene-Walters and Lieutenant [John] Cummings of the Bridgeport Police Department. . . . Lyons offered evidence through the cross-examination of Detective Slaiby. The court received a document in evidence as a full exhibit for purposes of the

hearing and marked state's exhibit number [1]. On January 31, 2017, a federal magistrate signed a federal search warrant for 349 Noble Avenue [in Bridgeport]." The court quoted a description of the property that was set forth in an affidavit in support of the warrant, which described the property as "a multifamily, wood-framed, Victorian style residence. . . . The residence has tan siding, light grey asphalt shingles and white trim around the windows and roof line. There are two entrances located on opposite sides of the front of the residence. The entrance on the left side has bright red painted steps. The entrance on the right has . . . dark red, almost maroon color painted steps. The porch area on the right side has green colored columns and green trim around the red colored door. There is a driveway and parking area to the left of the left entrance and a driveway and parking area to the right of the right entrance. The number 349 is clearly visible from the street and is affixed to one of the green columns at the left entrance."

The court further stated: "Detective Slaiby testified he was a part of a task force team numbering some twenty law enforcement officers from various state and federal agencies, including [the Department of] Homeland Security, that executed the search warrant intended for [the] address . . . 349 Noble Avenue. That task force at 6 a.m. on February 1, 2017, executed the search warrant signed by the [federal] magistrate authorizing the search of 349 Noble Avenue, not 351 Noble Avenue. Testimony revealed that 351 Noble Avenue is a separate and unconnected [unit].

"Detective Slaiby testified he never saw a warrant before entering the 351 [Noble Avenue] address; that he was aware there was a federal search warrant, however, he had not reviewed the search warrant prior to its execution; but [that] he had surveyed the area from the front of 349 Noble Avenue. Other law enforcement agents had already entered the residence prior to Detective Slaiby. He testified the residence entered was a large structure with multiple floors and multiple rooms on each floor. A gun and two bags of raw marijuana were found in the third floor bedroom by another police officer. The gun was on top of the bed when Detective Slaiby went into the room. An identification card with the name 'Sean Brown' was also found in the room. There was no address listed on the identification card; the photo on the identification card was identified by Detective Slaiby in court as Lyons. The police did not find identification for 'Sean Brown' anywhere else in the house. Other identifications were found in the room with Lyons' name. There was a sign hanging in the room that read 'I do not give consent to search.' Inside the officers found pants and shirts and other men's clothing. In Lyons' room the task force located and seized passports and ID cards. . . . One identification card with a picture of . . . Lyons bore the name 'Sean Brown'; the others with his picture bore the name 'Gavin

Augustus Lyons.' One identification card was found in a wallet, which was, in turn, inside the pocket of a pair of pants. During the search, officers found a Metro PCS receipt or bill for Sean Brown. Also seized [were] two small amounts of marijuana and a gun.

"Although Lyons was on the first floor of the building when Detective Slaiby first encountered him, federal agents informed Detective Slaiby that Lyons was found in the third floor bedroom when the SWAT team entered the 351 [Noble Avenue] residence. Lyons was later brought up to the third floor bedroom to confirm that it was his room. Detective Slaiby identified . . . Lyons at the suppression hearing. Detective Slaiby also testified that a large amount of contraband was found in a closet in a bucket in the room that Greene-Walters was found in.

"David Gordon testified that, at the time of the search, he had resided at 351 Noble Avenue for ten years [and] [t]hat he has an identification card that states that his address is 351 Noble Avenue. David Gordon further testified that the police broke in the door when they executed the warrant because the door was locked. Moreover, David Gordon testified that all the rooms in the house have locks on them. David Gordon testified that he rented 351 Noble Avenue as a whole house and collected money from individuals to whom he subsequently rented rooms. He stated that he would give out the keys to people for their room and replace any lost keys. David Gordon testified that 349 and 351 Noble Avenue have separate driveways, separate front porches and the addresses for each are displayed on the front porches. Other persons reside at 349 Noble [Avenue] and you cannot enter 349 [Noble Avenue] from the inside of 351 [Noble Avenue], and . . . the reverse is true. [Moreover] 349 Noble Avenue and 351 Noble Avenue do not share a living room, kitchen or basement. The building is a duplex. The gas and electric meters are separate.

"Greene-Walters testified that, at the time of the search, she [had] resided at 351 Noble Avenue for almost a year. She testified that when the police entered her residence, she was in bed and that they had to knock in the door because it was locked. She further testified that she had some mail in her room, which the police confiscated. The mail was addressed to her at 351 Noble Avenue. She further testified that the building has two driveways [and] separate electric and gas meters . . . [t]hat you cannot gain access . . . [to] 349 Noble [Avenue] from inside 351 Noble Avenue . . . [and] [t]hat the address numbers 349 and 351 are displayed on the front porch.

"Prince Gordon testified that, at the time of the search, he had been resid[ing] at 351 Noble Avenue for nine years. His bedroom was on the first floor and . . . his door had a lock. When the police executed the

warrant, he was sleeping in his room with the door locked. As a result, the police knocked in the door when they searched his room. The police seized his passport, his pistol permit, his birth certificate, and his driver's license. The driver's license was in his wallet, which was on the dresser in the room. The address listed on his license was 351 Noble Avenue. He testified that 349 Noble Avenue and 351 Noble Avenue have separate driveways, separate front entrances, separate mailboxes, separate electric meters located in the front of the [duplex] and separate gas meters located on the side [of] the [duplex]. Once inside 351 Noble Avenue you cannot enter 349 Noble Avenue. Each [unit] has a separate living room and kitchen.

"Bridgeport Lieutenant . . . Cummings testified that based upon his investigation . . . the building on Noble Avenue is a multifamily addressed as 349 and 351 Noble Avenue. He has been inside 351 Noble Avenue and testified that 349 and 351 Noble Avenue are separate units. . . . The court credits the testimony of each witness testifying and has applied appropriate weight to exhibit [1]."

On the basis of the testimony and documentary evidence, the court first determined that Lyons and the other defendants had met their burden of establishing an expectation of privacy necessary to challenge "the warrantless search and seizure of their person and property, which occurred [on] February 1, 2017, at their respective premises located at 351 Noble Avenue" in Bridgeport. Next, the court addressed the state's claim that the search was authorized by the contents of the affidavit that was executed in support of the search warrant. The court explained that "[t]he state's claim that, despite being executed at the wrong address, the warrant was executed at the place described in the warrant depends entirely on its premise that the affidavit is part of the warrant." The court, however, concluded that the warrant did not incorporate the contents of the affidavit, that the affidavit was not available to the executing officers, that there was no evidence that the officers executing the warrant had prepared the warrant or participated in the surveillance of 351 Noble Avenue, that the warrant "clearly and unambiguously identifie[d] the place to be searched as 349 Noble Avenue," "with no further description," and, thus, that the search of a different place constituted a warrantless search that was "presumptively unlawful . . . ." Because the state did not claim any exception to the warrant requirement, the court granted the defendants' motions to suppress. After the informations against the defendants were dismissed, the court granted the state's request for permission to appeal, and this appeal followed. Additional facts will be set forth as necessary.

We first set forth our standard of review of a trial court's findings and conclusions related to a motion to

suppress, which is well defined. See *State* v. *Jones*, 113 Conn. App. 250, 255–56, 966 A.2d 277, cert. denied, 292 Conn. 901, 971 A.2d 40 (2009). "When reviewing a trial court's [ruling on] a motion to suppress, [a] finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the [trial court's] memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Houghtaling*, 326 Conn. 330, 339–40, 163 A.3d 563 (2017), cert. denied,    U.S.    , 138 S. Ct. 1593, 200 L. Ed. 2d 776 (2018); see also *State* v. *Boyd*, 295 Conn. 707, 717, 992 A.2d 1071 (2010), cert. denied, 562 U.S. 1224, 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011).

I

The state's first claim is that the trial court erred when it determined that Lyons had met his burden of proving an expectation of privacy in the areas searched and, therefore, concluded that he had standing to proceed with his motion to suppress.[4] We disagree.

The following additional facts are necessary for a resolution of this claim. At the hearing on the motions to suppress, Lyons did not testify. Instead, he called Slaiby as his sole witness. Slaiby testified that, although he was part of a team that had executed the warrant, he waited for the SWAT team to clear the residence before taking any action after entering the house. After the SWAT team completed its sweep of the residence, Slaiby went to the third floor. At that time, Lyons was already on the first floor, as all of the residents had been brought to the first floor and were gathered near a bathroom. Slaiby testified further that there was a door to the room on the third floor, although he could not remember if there was a lock on the door. In that room, Slaiby found paperwork, including a passport and identification card, as well as an identification card in a wallet that was in a pair of jeans. Slaiby testified that members of the SWAT team had related to him that Lyons was located in the third floor room at the time they entered the residence and that Lyons had told him that it was Lyons' bedroom.[5] After reviewing an inventory of Lyons' clothing taken at the time of his arrest to refresh his recollection, Slaiby indicated that Lyons was wearing a bathrobe and slippers when he

was arrested. On cross-examination of Slaiby, the state challenged that testimony on the ground that the document used to refresh Slaiby's recollection was for a man named "Sean Brown." Slaiby further testified on redirect that other identifications found contained the name "Gavin Augustus Lyons," along with photographs of Lyons.

The court, in determining that Lyons met his burden of establishing a reasonable expectation of privacy sufficient to contest the search of 351 Noble Avenue, noted that Lyons kept important documents in his room, including his passport, birth certificate and other documents issued by the governments of Jamaica and the United States. The court further stated: "Detective Slaiby recognized that only . . . Lyons resided in his third floor bedroom. . . . Although Detective Slaiby could not say if [Lyons'] door had a lock on it, the three residents of 351 Noble Avenue who testified explained that each of the bedrooms in the house had a door with a lock installed on it. David Gordon paid rent to the owner of the building and he, in turn, charged other people to live there. Each room was rented separately and each had its own key and lock for the tenant to use, which he could replace if the renter lost it. . . . The search of [Lyons'] separately keyed room in which he alone resided constitutes an intrusion into a place he had manifested an intention to keep private." (Citations omitted.)

In reaching its conclusion, the court rejected the state's claim that residents of a multiunit dwelling have less protection under the fourth amendment. The court, citing *State* v. *Kono*, 324 Conn. 80, 121, 152 A.3d 1 (2016), noted that our Supreme Court has rejected the "distinction between the societally recognized privacy expectations of those able to afford to live in a single-family home and those less well-off who live in multiunit condominium[s] or public housing developments." The court also cited *State* v. *Benton*, 206 Conn. 90, 95, 536 A.2d 572, cert. denied, 486 U.S. 1056, 108 S. Ct. 2823, 100 L. Ed. 2d 924 (1988), for the proposition that persons "residing in an apartment, or persons staying in a hotel or motel have the same fourth amendment rights to protection from unreasonable searches and seizures and the same reasonable expectation of privacy as do the residents of any dwelling." (Emphasis omitted; internal quotation marks omitted.) Finally, the court noted that, although the evidence demonstrated that "Lyons was a rent paying resident of 351 Noble Avenue who slept in his own bed the night before [the] search, even an overnight guest has an expectation of privacy protected by the fourth amendment in his or her host's home . . . . Even though no witness could say how long the man in his robe and slippers had been in the house, the inference is inescapable that he slept in the house overnight by himself in a bed where he had such garments." (Citations omitted.)

On appeal, the state bases its challenge to the court's determination that Lyons met his burden of establishing a reasonable expectation of privacy on three grounds. First, the state claims that the court relied on inadmissible hearsay when it found that "federal agents informed Detective Slaiby that Lyons was found in the third floor bedroom when the SWAT team entered . . . . Lyons was later brought up to the third floor bedroom to confirm that it was his room." Second, the state claims that the court improperly took judicial notice of facts not testified to at the hearing when it noted that "Slaiby filed an inventory of seized property in the Superior Court, listing as seized property . . . two passports, a birth certificate, social security card and Jamaican Ministry of Foreign Affairs document for Gavin Augustus Lyons." Third, the state alleges that the court made factual determinations that are not supported by the record when it found that Lyons had "met his burden to prove by a preponderance of the evidence that he had an expectation of privacy in the place at issue. . . . Additional evidence that this was a place . . . Lyons expected to be secure from intrusion comes from his keeping the most sensitive and important documents in that place: his passport, birth certificate and other documents issued by the governments of Jamaica and the United States. Detective Slaiby recognized that only . . . Lyons resided in his third floor bedroom." (Citations omitted.)

Before we address each of those claims, we set forth the general principles governing our review of the state's claim that Lyons lacked a reasonable expectation of privacy in the premises searched that deprived him of standing to pursue his motion to suppress. "To determine whether a person has a reasonable expectation of privacy in an invaded place or seized effect, that person must satisfy the *Katz* test. See *Katz* v. *United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). The *Katz* test has both a subjective and an objective prong: (1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises or seized property]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . The burden of proving the existence of a reasonable expectation of privacy rests [with] the defendant. . . . *State* v. *Jackson*, 304 Conn. 383, 395, 40 A.3d 290 (2012)." (Internal quotation marks omitted.) *State* v. *Houghtaling*, supra, 326 Conn. 341; see also *Simmons* v. *United States*, 390 U.S. 377, 389, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968) ("rights assured by the [f]ourth [a]mendment are personal rights, and . . . they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure"). "Whether a defendant's actual expectation of privacy . . . is one that society

is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Internal quotation marks omitted.) *State* v. *Boyd*, supra, 295 Conn. 718. "[T]he trial court's finding [on the question of standing] will not be overturned unless it is legally or logically inconsistent with the facts found or involves an erroneous rule of law." (Internal quotation marks omitted.) *State* v. *Jones*, supra, 113 Conn. App. 266. Nevertheless, "although we must defer to the trial court's factual findings, determining whether those findings establish standing is a question of law, over which we exercise plenary review." *State* v. *Houghtaling*, supra, 340.

"It is well established that the owner or tenant of a dwelling has standing to contest the legality of a search of that premises. . . . However, [t]he capacity to claim the protection of the fourth amendment does not depend upon a proprietary interest, permanency of residence, or payment of rent but upon whether the person who claims fourth amendment protection has a reasonable expectation of privacy in the invaded area. . . . Further, the fact that a person does not have the exclusive use of an area does not bar his having a reasonable expectation of privacy that furnishes standing to object to a government seizure. . . . Accordingly, a person who makes a telephone call from a public telephone booth may challenge the state's warrantless interception of the call . . . and an overnight guest has the right to contest a warrantless entry into his or her host's home. . . . Thus, a person may have a sufficient interest in a place other than his home to enable him to be free in that place from unreasonable searches and seizures . . . so long as the place is one in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to a manifested expectation of privacy." (Internal quotation marks omitted.) *State* v. *Jones*, supra, 113 Conn. App. 267.

In *Minnesota* v. *Olson*, 495 U.S. 91, 96–97, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990), the United States Supreme Court held that a person's status as an overnight guest, alone, is sufficient to establish an expectation of privacy in the home that society would recognize as reasonable. In reaching that conclusion, the court explained: "We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. . . . That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy." (Citation omitted.) Id., 99; see also *State* v. *Aviles*, 277 Conn. 281, 292 n.8, 891 A.2d 935 (recognizing that overnight guest has expectation of privacy), cert. denied,

549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006); cf. *Rakas* v. *Illinois*, 439 U.S. 128, 142, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) ("casual visitor who walks into a house one minute before a search of the house commences and leaves one minute after the search ends . . . [has] absolutely no interest or legitimate expectation of privacy in the [house]"); *State* v. *Hill*, 237 Conn. 81, 96–97, 675 A.2d 866 (1996) (momentary stop by defendant at apartment that he allegedly entered with consent of tenants was not sufficient to establish standing to contest search of apartment); *State* v. *Callari*, 194 Conn. 18, 23–24, 478 A.2d 592 (1984) (transient social guest lacked reasonable expectation of privacy to contest search of house), cert. denied, 469 U.S. 1210, 105 S. Ct. 1178, 84 L. Ed. 2d 327 (1985).

A

The state first claims that the trial court improperly determined that Lyons had a reasonable expectation of privacy on the basis of hearsay statements, specifically, the statement of SWAT team members to Slaiby that Lyons was located in the third floor bedroom and Lyons' statement to Slaiby that the third floor room was his bedroom. Lyons counters that the state cannot show any harm resulting from the trial court's evidentiary rulings. Specifically, Lyons claims that this court "need not reach any of the challenges raised to the trial court's finding that Lyons had standing to contest the search because the evidence that was admitted without objection from the state and the unchallenged findings of the trial court based on Slaiby's testimony of what he personally observed or knew, soundly support the trial court's determination that [the third floor bedroom] was Lyons' bedroom in which he had manifested an expectation of privacy." In support of his claim, Lyons points to certain evidence not challenged by the state. That evidence includes men's clothing that was found in the third floor bedroom; personal items found in the third floor bedroom such as passports and identification cards, one of which was found in the pocket of a pair of pants found in the bedroom and had the name "Sean Brown" but contained a photograph of Lyons, and another of which had Lyons' name and photograph on it; and the facts that the police did not find identification for Lyons or Sean Brown in other locations in the house, that no other person's identification was found in the third floor bedroom, and that Slaiby took a bathrobe and slippers from Lyons after he arrested him. We agree with Lyons.

We set forth our standard of review applicable to the state's evidentiary claim. "It is well settled that, absent structural error, the mere fact that a trial court rendered an improper ruling does not entitle the party challenging that ruling to obtain a new trial. An improper ruling must also be harmful to justify such relief. . . . The harmfulness of an improper ruling is material irrespec-

tive of whether the ruling is subject to review under an abuse of discretion standard or a plenary review standard. . . . When the ruling at issue is not of constitutional dimensions, the party challenging the ruling bears the burden of proving harm. . . . It is a fundamental rule of appellate review of evidentiary rulings that if [the] error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him. . . . *State* v. *Gonzalez*, 272 Conn. 515, 527, 864 A.2d 847 (2005); see also *State* v. *Kirsch*, 263 Conn. 390, 412, 820 A.2d 236 (2003) (in order to establish reversible error on an evidentiary impropriety, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse). We do not reach the merits of [a] claim [where] the [appellant] has not briefed how he was harmed by the allegedly improper evidentiary ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Toro*, 172 Conn. App. 810, 816–17, 162 A.3d 63, cert. denied, 327 Conn. 905, 170 A.3d 2 (2017). "[W]ith regard to evidentiary rulings, this court, on multiple occasions, has declined to review claims where the appellant fails to analyze harmful error in his or her principal brief." *State* v. *Myers*, 178 Conn. App. 102, 107, 174 A.3d 197 (2017).

The state's brief is devoid of any analysis of how it was harmed by the trial court's admission of the challenged testimony. The state's bare assertion that "the court abused its discretion and committed error by allowing the testimony and then using [the] inadmissible testimony to find that Lyons met his burden of proving an expectation of privacy" fails to explain adequately the harm caused by the alleged improper admission of the testimony. In the absence of any analysis concerning how the state was harmed by the admission of the testimony, we are unable to conclude that the evidence had any bearing on the outcome of the suppression hearing. See *State* v. *Njoku*, 163 Conn. App. 134, 145–46, 133 A.3d 906, cert. denied, 321 Conn. 912, 136 A.3d 644 (2016). Therefore, in light of the state's failure to brief how it was harmed by the court's evidentiary ruling, we decline to consider whether the court's ruling was an abuse of discretion.[6] See *State* v. *Myers*, supra, 178 Conn. App. 108.

B

The state next claims that the court improperly took judicial notice of facts not presented at the hearing when it noted that "Slaiby filed an inventory of seized property in the Superior Court, listing as seized property . . . two passports, a birth certificate, social security card and Jamaican Ministry of Foreign Affairs document for Gavin Augustus Lyons." We disagree.

The following additional facts are necessary to this claim. In its memorandum of decision, the court set forth the items found in the third floor bedroom of 351

Noble Avenue. The court stated, in part, that in Lyons' room, "the task force located and seized passports and ID cards." Following that sentence the court cited the trial court file, with the docket number CR-17-294868-S, which pertains to the charges against Lyons, and it referenced a "part B inventory number 28247 WW, items listed under number 4," followed by a footnote reference. In the footnote, the court stated: "The court notes that Slaiby filed an inventory of seized property in the Superior Court, listing as seized property item [number] 4 two passports, a birth certificate, social security card and Jamaican Ministry of Foreign Affairs document for Gavin Augustus Lyons. Conn. Code Evid. §§ 2-1 and 2-2 (a). See T1 15 (defendant's request to take notice). The inventory bears the first of four sequential docket numbers assigned to the cases arising from this search."

The trial court file includes a uniform arrest report filed by Slaiby, along with an investigation report,[7] in which Slaiby stated: "During the search of Lyons' bedroom, I located a wallet inside a black pair of jeans. I located a photographic ID card that had Lyons' face on it with the name 'Sean Brown.' [A sergeant] also located two Jamaican passports in a closet that had Lyons' face on it with the name 'Gavin Augustus Lyons.' . . . Investigators asked Lyons where his ID card was and he stated inside a wallet in black jeans. This was the same pair of jeans where I located the ID card with the name Sean Brown. I also located numerous pieces of mail with the name Sean Brown inside Lyons' bedroom. Investigators at this time did not know for sure what identity Lyons was attempting to utilize, as investigators found two passports with the name Gavin Lyons and one ID card with the name Sean Brown, which Lyons said was his proper ID card." The file also includes a "Prisoner Property Receipt"[8] for Lyons, which indicates that a bathrobe and slippers had been taken from Lyons upon his arrest, as well as an "Inventory of Property Seized" bearing the docket number pertaining to Lyons' case, which references the two Jamaican passports, a birth certificate, a social security card and a document from the Jamaican Ministry of Foreign Affairs for "Gavin Augustus Lyons." Finally, the trial court file also contains a motion for return of seized property that was filed by Lyons, in which he sought the return of his birth certificate, social security card and passport, which had been seized at the time of his arrest on January 31, 2017.

During the hearing, the inventory of the seized property filed by Slaiby was referenced. When Slaiby was asked what kind of paperwork was found in the third floor bedroom, he responded, "it was paperwork such as a passport and an . . . ID card." After Slaiby stated that he could not recall whether the passport had been seized, he was asked if it would refresh his "recollection [to look] at the inventory that was seized?" After reviewing the inventory, he stated that his recollection

had been refreshed and that the passport had been seized. The prosecutor asked that the document be marked "for exhibit for identification,"[9] and Lyons' attorney noted that the document *was in the clerk's file.*

We first set forth our standard of review. "A trial court's determination as to whether to take judicial notice is essentially an evidentiary ruling, subject to an abuse of discretion standard of review. . . . In order to establish reversible error, the [party challenging the ruling] must prove both an abuse of discretion *and a harm that resulted from such abuse.* . . . In reviewing a trial court's evidentiary ruling, the question is not whether any one of us, had we been sitting as the trial judge, would have exercised our discretion differently . . . . Rather, our inquiry is limited to whether the trial court's ruling was arbitrary or unreasonable. . . .

"The doctrine of judicial notice excuses the party having the burden of establishing a fact from introducing formal proof of the fact. Judicial notice takes the place of proof. . . . There are two types of facts considered suitable for the taking of judicial notice: those [that] are common knowledge and those [that] are capable of accurate and ready demonstration. . . . Courts must have some discretion in determining what facts fit into these categories. It may be appropriate to save time by judicially noticing borderline facts, so long as the parties are given an opportunity to be heard. . . . Notice to the parties [however] is not always required when a court takes judicial notice. Our own cases have attempted to draw a line between matters susceptible of explanation or contradiction, of which notice should not be taken without giving the affected party an opportunity to be heard . . . and matters of established fact, the accuracy of which cannot be questioned, such as court files, which may be judicially noticed without affording a hearing." (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *Scalora* v. *Scalora,* 189 Conn. App. 703, 713–14, 209 A.3d 1 (2019); see also Conn. Code Evid. § 2-1; *In re Natalie J.,* 148 Conn. App. 193, 206–207, 83 A.3d 1278, cert. denied, 311 Conn. 930, 86 A.3d 1056 (2014). It is well established that the trial court "may take judicial notice of the files of the Superior Court in the same or other cases." (Internal quotation marks omitted.) *Larmel* v. *Metro North Commuter Railroad Co.,* 200 Conn. App. 660, 662 n.2, 240 A.3d 1056, cert. granted on other grounds, 335 Conn. 972, 240 A.3d 676 (2020); see also *Echeverria* v. *Commissioner of Correction,* 193 Conn. App. 1, 3 n.1, 218 A.3d 1116 (appellate court took judicial notice of file in underlying criminal case), cert. denied, 333 Conn. 947, 219 A.3d 376 (2019); *Wasson* v. *Wasson,* 91 Conn. App. 149, 151 n.1, 881 A.2d 356 ("[a]ppellate [c]ourt, like the trial court, may take judicial notice of files of the Superior Court in the same or other cases" (internal quotation marks omitted)), cert. denied, 276 Conn. 932, 890 A.2d 574 (2005).

In the present case, the court took judicial notice of only the contents of the court file. Thus, it was not required to give the parties notice and an opportunity to be heard before it did so. In any event, the state can hardly claim surprise that the court referenced the inventory of seized property that was located in the court file. The document was discussed at the hearing and specifically referred to by the state. Furthermore, the state's argument that it was not proper for the court to take judicial notice of the inventory of seized property because its contents were "controverted facts" is without merit. First, the state has not identified any dispute over the contents of the inventory document. Second, the court relied on what was in the court file simply to identify the items seized by the police during the search, not to conclude whether the information in the items was true. For example, the fact that the court noted that the court file contained a purported birth certificate, social security card and passport for Lyons does not mean that the court accepted that the documents were genuine. What was important to the court was the nature of the documents kept by Lyons in the third floor bedroom, and there is no dispute as to the nature of those documents.

In addition, the state, again, has failed to brief how it was harmed by the court's evidentiary ruling. In the absence of such an analysis, we cannot conclude that the court abused its discretion in taking judicial notice of the inventory of seized property filed by Slaiby. See *State* v. *Gonzalez*, 106 Conn. App. 238, 249, 941 A.2d 989, cert. denied, 287 Conn. 903, 947 A.2d 343 (2008). Moreover, because the state must show both an abuse of discretion and harm resulting from the court's evidentiary ruling, even if we assume, without deciding, that the court abused its discretion, we would be hard pressed to find any harm resulting from the court's taking judicial notice of the inventory of seized property when the record contains properly admitted testimony and numerous other references concerning the specific documents that were listed in that inventory. In particular, there were multiple instances in which Slaiby testified regarding certain of the documents found in the third floor bedroom, including the passport and identification card. Accordingly, any possible error in the trial court's ruling was harmless.

C

The state's third claim with respect to the trial court's finding that Lyons possessed a reasonable expectation of privacy in the third floor bedroom challenges the court's factual determinations. Specifically, the state alleges that the court made factual determinations that are not supported by the record when it found that Lyons had "met his burden to prove by a preponderance of the evidence that he had an expectation of privacy in the place at issue. . . . Additional evidence that this

was a place . . . Lyons expected to be secure from intrusion comes from his keeping the most sensitive and important documents in that place: his passport, birth certificate and other documents issued by the governments of Jamaica and the United States. Detective Slaiby recognized that only . . . Lyons resided in his third floor bedroom." (Citations omitted.) We are not persuaded by the state's claim.

Our resolution of this claim requires little discussion in light of our determination regarding the state's other claims. See parts I A and B of this opinion. The record demonstrates that, inside the third floor bedroom, Slaiby found personal items such as a passport and an identification card, as well as men's clothing, including a pair of pants that contained a wallet with an identification card. Although one of the identification cards found contained the name "Sean Brown," it had a photograph of Lyons on it, and other identifications that contained Lyons' name and photograph were also found in that bedroom. Moreover, identification cards for either Sean Brown or Lyons were not found in other portions of 351 Noble Avenue, nor was an identification for anyone else found in the third floor bedroom. There was testimony showing that a passport and other personal documents for either Sean Brown or Lyons were found in the third floor bedroom, and Lyons filed a motion seeking the return of his passport, social security card and birth certificate, which had been seized during the search and which the trial court granted with respect to the social security card and birth certificate. Accordingly, the trial court's finding that Lyons had a reasonable expectation of privacy was not clearly erroneous and was supported by sufficient evidence in the record.

Moreover, when Lyons was arrested, he was wearing a bathrobe and slippers, which, as we already determined, supported a conclusion that, at a minimum, he was an overnight guest at the 351 Noble Avenue residence. Given that the search of 351 Noble Avenue commenced around 6 a.m., that, at the time Slaiby entered 351 Noble Avenue, all of the residents had been gathered downstairs near a first floor bathroom, and that men's clothing with a wallet and identification card, along with other identifications bearing either Lyons' name or photograph or both were found in the third floor bedroom, the court reasonably could infer that, at the time of the search, Lyons was sleeping in that bedroom as either a resident or, at a minimum, an overnight guest. Our Supreme Court has made clear that an overnight guest has an expectation of privacy. See *State* v. *Aviles*, supra, 277 Conn. 292 n.8. Therefore, we agree with the trial court that, at a minimum, the evidence was sufficient to prove that Lyons was an overnight guest and, therefore, was sufficient to support the court's conclusion that Lyons met his burden of establishing, by a preponderance of the evidence, that he had a reasonable expectation of privacy in the place

searched.

## II

The state next claims that the court improperly granted the defendants' motions to suppress the items seized from the search of 351 Noble Avenue. We disagree.

The following additional facts are necessary for our resolution of this claim. On January 31, 2017, a United States magistrate signed a search and seizure warrant that authorized the search of 349 Noble Avenue in Bridgeport, which is one half of a multifamily residence. Specifically, the building at the premises is a duplex, with 349 being designated as the property on the left when facing it from the street and 351 being the property on the right. In the space on the warrant designated for identifying the person or describing the property to be searched, the warrant merely stated "349 Noble Avenue, Bridgeport, Connecticut." Just below that address, the warrant included preprinted language stating: "I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal (identify the person or describe the property to be seized)," which was followed by the reference: "See Attachment A." Attachment A to the warrant was a detailed list of the items to be seized.

The magistrate also had before him an application for the search warrant that had been executed by Brendan P. Lundt, a special agent of Homeland Security Investigations, New Haven, as well as an affidavit executed by Lundt in support of the application for the search warrant. The application also referenced 349 Noble Avenue in Bridgeport as the property to be searched and, for the facts on which the application was based, the application stated: "See Affidavit of . . . Special Agent, Brendan P. Lundt, attached hereto." The affidavit stated that the property to be searched was located at 349 Noble Avenue and described that property as "a multifamily, wood-framed, Victorian style residence. . . . The residence has tan siding, light grey asphalt shingles and white trim around the windows and roof line. There are two entrances located on opposite sides of the front of the residence. The entrance on the left side has bright red painted steps. The entrance on the right has . . . dark red, almost maroon color painted steps. The porch area on the right side has green colored columns and green trim around the red colored door. There is a driveway and parking area to the left of the left entrance and a driveway and parking area to the right of the right entrance. The number 349 is clearly visible from the street and is affixed to one of the green columns at the left entrance." In his affidavit, Lundt stated that he was "directing the investigation into members and associates of a narcotics trafficking organization that operates in . . .

Bridgeport," which included physical surveillance of 349 Noble Avenue, the use of information by confidential informants and controlled purchases of narcotics. On the basis of information gathered, Lundt attested that the premises located at 349 Noble Avenue was a stash location run by a black male of Jamaican descent, that a confidential informant stated that marijuana and cocaine are sold from the premises and that the seller "occupies the third floor apartment located on the right side of the residence when facing it from the street." Because Lundt believed that public disclosure of the information in the affidavit would compromise the ongoing investigation, he requested that the affidavit and accompanying warrant be sealed.[10]

In granting the defendants' motions to suppress, the court found that the warrant does not "reference or incorporate the contents of the affidavit" and that the only description of the place to be searched was the address given, which "clearly and unambiguously identifie[d] the place to be searched as 349 Noble Avenue" and left "no room for interpretation." The court further found that there was no evidence to support the state's assertion that the affidavit was attached to the warrant and that the state's "factual premise that the affidavit was part of the warrant . . . [was] contrary to the evidence," given that the warrant and affidavit were under seal in federal court. After finding that the warrant did not incorporate the contents of the affidavit, the court explained that the structure to be searched was "easily identified as a duplex with two separate addresses (two driveways, parking areas, walkways from [the] sidewalk with separate gates, porches, mailboxes and street-fronting doors, [and] multiple utility meters for gas and electric). The warrant issued to search 349 Noble Avenue with no further description. The SWAT [team] executed the warrant on the right . . . side of the house where the hearing evidence shows the number 351 is affixed to the siding by the front door.

"A search conducted under the purported authority of a warrant that actually was issued to search a different place is, under law, a warrantless search. The search of 351 Noble Avenue . . . was then presumptively unlawful under the fourth amendment [to the United States constitution] . . . ." Because the state relied "entirely on the warrant as legal authorization for the search . . . [and did] not claim any exception to the warrant requirement," the court granted the motions to suppress.

We begin with an examination of the law governing searches and seizures under the fourth amendment and the warrant requirements of the federal constitution. The fourth amendment to the United States constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const., amend.

IV. It is well established in fourth amendment jurisprudence that "physical entry of the home is the chief evil against which the wording of the [f]ourth [a]mendment is directed." (Internal quotation marks omitted.) *Payton* v. *New York*, 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Therefore, "[i]t is a basic principle of [f]ourth [a]mendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." (Internal quotation marks omitted.) Id., 586. As the United States Supreme Court has explained, "[t]he [f]ourth [a]mendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: The right of the people to be secure in their . . . houses . . . shall not be violated. That language unequivocally establishes the proposition that [a]t the very core [of the fourth amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (Internal quotation marks omitted.) Id., 589–90. Accordingly, "[i]t is axiomatic that the police may not enter the home without a warrant or consent, unless one of the established exceptions to the warrant requirement is met."[11] *State* v. *Aviles*, supra, 277 Conn. 292; see also *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) ("[i]t is well settled under the [f]ourth and [f]ourteenth [a]mendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions" (internal quotation marks omitted)).

"The [f]ourth [a]mendment's requirements regarding search warrants are not 'formalities.' *McDonald* v. *Unites States*, 335 U.S. 451, 455, 69 S. Ct. 191, 93 L. Ed. 153 (1948). By requiring police officers first to obtain a warrant before they search a person's home, unless some exception applies that permits a warrantless search, 'the [f]ourth [a]mendment has interposed a magistrate between the citizen and the police,' 'not to shield criminals nor to make the home a safe haven for illegal activities,' but rather to ensure 'that an objective mind might weigh the need to invade that privacy in order to enforce the law.' Id.

"Indeed, the [f]ourth [a]mendment's demand that search warrants 'particularly describ[e] the place to be searched' . . . provides a 'limitation curtailing the officers' discretion when executing the warrant,' so that 'the safeguard of having a magistrate determine the scope of the search is [not] lost.' *United States* v. *George*, 975 F.2d 72, 76 (2d Cir. 1992); *Maryland* v. *Garrison*, 480 U.S. 79, 84, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987) (noting that the [f]ourth [a]mendment's particularity 'requirement ensures that the search will

be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the [f]ramers intended to prohibit')." *United States* v. *Voustianiouk*, 685 F.3d 206, 210–11 (2d Cir. 2012). "The test for whether a sufficient description of the premises to be searched is given in a search warrant was stated in *Steele* v. *United States*, [267 U.S. 498, 503, 45 S. Ct. 414, 69 L. Ed. 757 (1925)], as follows: It is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." (Internal quotation marks omitted.) *United States* v. *Prout*, 526 F.2d 380, 387 (5th Cir.), cert. denied, 429 U.S. 840, 97 S. Ct. 114, 50 L. Ed. 2d 109 (1976). "In determining the permissible scope of a search that has been authorized by a search warrant . . . we must look to the place that the magistrate judge who issued the warrant intended to be searched [and] *not to the place that the police intended to search when they applied for the warrant.*" (Emphasis added; internal quotation marks omitted.) *United States* v. *Bershchansky*, 788 F.3d 102, 111 (2d Cir. 2015).

Thus, we must look to the text of the warrant itself to determine the permissible scope of the search that was authorized by the warrant. See id. In the present case, the warrant described the place to be searched as "349 Noble Avenue" in Bridgeport and included no other description of the property; accordingly, the warrant limited the scope of the search to 349 Noble Avenue.

The circumstances of the present case are analogous to those in *United States* v. *Bershchansky*, supra, 788 F.3d 102, and *United States* v. *Voustianiouk*, supra, 685 F.3d 206, in which the United States Court of Appeals for the Second Circuit found that both searches were conducted without a valid warrant. In *Voustianiouk*, federal agents went to a two-story building in New York City armed with a warrant to search an apartment on the first floor. *United States* v. *Voustianiouk*, supra, 208. Although the warrant did not refer to the name of the person who lived in the first floor apartment and authorized a search of that residence only, agents discovered on the morning of the search that the suspect they were investigating lived on the second floor of the building. Id., 209–10. Because he was home, they decided to search his second floor apartment, instead of the one listed in the warrant. Id., 210.

The court in *Voustianiouk* found that "[t]he officials in this case did not stray far from their search warrant. They merely ventured up a flight of stairs. But the [f]ourth [a]mendment does not permit the police to search one apartment simply because they have a warrant to search another that is nearby." Id., 208. Accordingly, the court found that the agents conducted a warrantless search that violated the fourth amendment. Id. In reaching that conclusion, the court emphasized that,

in determining the permissible scope of the search, it had to "look to the place that the magistrate judge who issued the warrant intended to be searched, not to the place that the police intended to search when they applied for the warrant." Id., 211. The court further stated: "We note that when officers search a location other than the one that the magistrate judge intended to be searched, as was the case here, there is no need to inquire into whether the warrant's description was sufficiently particular to satisfy the [f]ourth [a]mendment in order to determine if the search violated the [c]onstitution, because the search was conducted without the authorization of a warrant. Such a warrantless search, absent some exception, violates the [f]ourth [a]mendment not because the description in the warrant was insufficient or inaccurate, but rather because the agents executing the search exceeded the authority that they had been granted by the magistrate judge." (Footnote omitted.) Id., 212. Although the government in that case correctly pointed out that inaccuracies or ambiguities in a warrant do not necessarily invalidate a warrant, the court found that the warrant did not inaccurately describe the place to be searched but, rather, very clearly authorized a search of the first floor apartment. Id., 212–13. Finally, the court stated: "We are unable to conclude that the officers in this case reasonably relied on the warrant in their possession— which on its face explicitly authorized the search of the first-floor apartment—to conduct a search of the apartment on the second floor. Indeed, there can be no doubt that a search warrant for one apartment in a building does not permit the police to enter apartments other than the one specified in their warrant." Id., 215. Even though the court found that the officers were well-meaning, that did not "mean that they reasonably concluded that the warrant in their possession authorized the search they conducted"; id., 216–17; and there was no question that they could have called the magistrate that morning to obtain a new warrant for the second floor apartment. Id., 216.

Similarly, in *Bershchansky*, agents from the Department of Homeland Security had obtained a warrant to search an apartment in Brooklyn, New York, where they believed a computer contained child pornography. *United States* v. *Bershchansky*, supra, 788 F.3d 105. Although the warrant authorized the agents to search apartment 2 at the location where Yuri Bershchansky lived, they executed the warrant, instead, at apartment 1. Id. The government appealed from the decision of the United States District Court for the Eastern District of New York granting Bershchansky's motion to suppress evidence seized during the search. Id. The United States Court of Appeals for the Second Circuit affirmed, concluding that the agents conducted a warrantless search in violation of the fourth amendment when, instead of searching apartment 2, they searched apart-

ment 1, an apartment that the magistrate had not authorized them to search. Id., 111. The court in *Bershchansky* distinguished that case from those in which "courts have held warrants valid despite erroneous address numbers" on the ground that, in those cases, "other information in the warrant (or the executing officers' knowledge) strongly indicated a particular location other than the misidentified address." Id.

In the present case, the search of 351 Noble Avenue was conducted pursuant to a warrant that authorized the search of a different address. The search, therefore, constituted a warrantless search unless the warrant contained information indicating that the magistrate intended that 351 Noble Avenue be searched or the officers executing the warrant otherwise had knowledge of such an intent.

The state claims on appeal that "[t]his is a case where the officers thought that the building to be searched was a single unit and there was a factual mistake, learned after the execution of the warrant, regarding the actual address '351' [Noble Avenue]."[12] The state further claims that the court improperly failed to take into account the facts that "Lundt's affidavit was sworn to and subscribed by the same magistrate on the same day . . . it was signed [on] the same day as the application for a search and seizure warrant by the same magistrate . . . all of the court documents bore the same date and exact time of filing . . . and . . . all bore the same case number . . . ." The state refers to the error in the description of the place to be searched as a scrivener's error and claims that "Connecticut cases have routinely looked at all of the documents to determine if there was an error that can be corrected regarding the particularity requirement in a warrant application . . . ." According to the state, a warrant that contains a technically wrong address should not be invalidated if "it otherwise describes the premises with sufficient particularity so that the police can ascertain and identify the place to be searched." (Internal quotation marks omitted.) Specifically, the state relies on case law upholding warrants with technical errors when there is other information, either in the warrant itself or in an appended affidavit, that eliminates the possibility of actual error.

According to the state, although there was a mistake in the address listed on the warrant, that mistake is cured by reference to the Lundt affidavit that was filed in support of the application for the search warrant, which, according to the state, clearly demonstrates that the officers always intended to search the right side of the duplex—351 Noble Avenue—and did, in fact, search the place that the warrant was intended to cover. Thus, the state alleges that, because the warrant incorporated the affidavit by reference and was clearly available to the magistrate when the warrant was issued, the court

improperly concluded that "the warrant does not incorporate the contents of the affidavit and may be understood to not have been present since it remains under seal in the federal court." We disagree.

The state misunderstands the court's analysis. The court's conclusion was not based on whether the magistrate had access to Lundt's affidavit. Instead, the court's focus was on whether the *officers executing the warrant* knew of Lundt's affidavit or otherwise had reason to know that the warrant was intended to reach beyond 349 Noble Avenue. As the court noted: "Courts are disinclined to rule . . . a warrant as incorporating [an] affidavit when it does not expressly do so and *when the affidavit was not available to the executing officers*." (Emphasis added.) Thus, the court's statement that the Lundt affidavit was not present because it was under seal refers not to the fact that it was not present before the magistrate but to the fact that it was not available to the officers when the warrant was executed. Put another way, the existence of the Lundt affidavit, which was not appended to the warrant when it was executed, could not have informed the executing officers that the warrant was intended to authorize a search of 351 Noble Avenue. Therefore, even if we accept the state's claim that the affidavit was explicitly incorporated by reference into the warrant, that would not affect the court's analysis or change the result in this case, as it would not change the fact that, under the circumstances here, the mere existence of the affidavit and the warrant's reference to it did not give the executing officers any reason to believe that they were authorized to search 351 Noble Avenue.

The court, in its memorandum of decision, further noted that "in many cases upholding a search in the face of a claim that a warrant lack[s] particularity . . . the same law enforcement officers conducted the investigation, *prepared* the warrant application and led or participated in the execution, which was sufficient to prevent general rummaging, the evil against which the particularity clause of the fourth amendment is designed to protect." (Emphasis in original.) After noting that Slaiby, the only executing officer to testify at the suppression hearing, never conducted surveillance at the property, the court concluded that there was no evidence of facts that other courts have relied on to save an otherwise facially insufficient warrant. Thus, relying on *Bershchansky* and *Voustianiouk*, the court concluded that the officers executing the warrant exceeded the authority that had been granted to them by the magistrate. We agree with the court's analysis and conclusion.

The United States Supreme Court has stated that the particularity requirements of the fourth amendment must be satisfied "in the warrant, not in the supporting documents." *Groh* v. *Ramirez*, 540 U.S. 551, 557, 124

S. Ct. 1284, 157 L. Ed. 2d 1068 (2004); see also *Simon* v. *New York*, 893 F.3d 83, 94 (2d Cir. 2018) (Courts must "look directly to the text of a warrant to evaluate the scope of authority that it grants. . . . Searches and seizures that exceed the scope of the warrant are considered warrantless; they must be justified, if at all, by some exception to the warrant requirement." (Citation omitted; internal quotation marks omitted.)); *State* v. *Lucas*, 63 Conn. App. 263, 271, 775 A.2d 338 (courts must first examine description in warrant itself in determining whether description of place to be searched was sufficiently detailed), cert. denied, 256 Conn. 930, 776 A.2d 1148 (2001). Nevertheless, "a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Groh* v. *Ramirez*, supra, 557–58; see also *State* v. *Santiago*, 8 Conn. App. 290, 304–305, 513 A.2d 710 (1986) (Courts have recognized "a well established exception to the general rule that the warrant itself must describe with sufficient particularity the place to be searched and the property to be seized. In determining whether the description given the executing officer was sufficiently detailed, it is of course important initially to examine the description [that] appears in the warrant itself. If that description is inadequate, however, it is appropriate to look to the description appearing in the warrant application or affidavit *if* it is clear that the executing officers were in a position to be aided by these documents, as where they were attached to the warrant at the time of execution and incorporated therein by reference." (Emphasis in original; internal quotation marks omitted.)).

In *State* v. *Browne*, 291 Conn. 720, 734, 970 A.2d 81 (2009), our Supreme Court distinguished *Groh* and clarified that, in some circumstances, the affidavit need not accompany the warrant when executed to satisfy the fourth amendment. In *Browne*, the defendant moved to suppress marijuana seized during a search because the search warrant referenced cocaine and crack cocaine and not marijuana. Id., 726–27. The defendant argued that the seizure of the marijuana exceeded the scope of the warrant. Id. The state claimed that the warrant was sufficient because it incorporated the application and affidavit supporting the application, both of which consistently and continuously referenced marijuana. Id., 732. The defendant claimed that the state could not rely on the application and affidavit because they did not accompany the warrant when it was executed. Id., 723. Our Supreme Court rejected the defendant's claim. Id., 737. In particular, the court in *Browne* noted that accompaniment may not be required where, as in the present case, "the warrant application and affidavit are placed under seal to protect the identity and safety of a confidential informant . . . ." Id.

Relying on *Browne*, the state in the present case

claims that because the Lundt affidavit was incorporated into the warrant, it did not have to accompany the warrant when it was executed. We disagree with the state's reading of *Browne* as applied to the facts of the present case.

Our Supreme Court noted in *Browne* that "[a] further . . . distinction between *Groh* and this case is the actual knowledge of the parties involved. . . . In the present case . . . two of the executing officers . . . were the affiants for the warrant application and knew that the search warrant was based on probable cause to believe that the defendant was in possession of marijuana." (Citations omitted; footnote omitted.) Id., 738–39. This distinction clearly was important to the court in *Browne* because it declined to decide "whether accompaniment is required when the relevant documents are not sealed, or under circumstances indicating that the executing officers . . . [are] unaware of the items sought." Id., 737–38 n.12. Furthermore, the court noted that "[t]he only constitutional purpose that could be served by [the accompaniment] requirement would be to provide notice to uninformed officers of the authorized scope of the search so as to avoid a 'general, exploratory rummaging in a person's belongings.' *Coolidge* v. *New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). When, as in the present case, the factual circumstances indicate that the executing officers are clearly aware of the precise scope of the search, this purpose already is satisfied without accompaniment." (Emphasis omitted.) *State* v. *Browne*, supra, 291 Conn. 737 n.11. Thus, evidence that the executing officers had actual knowledge that the warrant was intended to cover a scope greater than what is reflected on its face is critical to determining whether accompaniment is necessary.

Given the evidence presented to the trial court in the present case, we conclude that, without the Lundt affidavit accompanying the warrant, there was no basis for the executing officers to know that the warrant was intended by the magistrate to authorize a search of 351 Noble Avenue. Slaiby, the only executing officer to testify at the suppression hearing, never saw the warrant. There is also no evidence that he ever saw the Lundt affidavit or the application for the warrant. He also testified that he was not involved in the presearch surveillance of 351 Noble Avenue. Although other executing officers may have had knowledge of the specific activities, including possible illegal conduct at 351 Noble Avenue, that were the bases for the issuance of the warrant, no such evidence was presented to the court. Consequently, unlike in *Browne*, there was no evidentiary basis in the present case for the trial court to conclude that the executing officers understood the intended reach of the warrant and executed it in accordance with that reach. We therefore agree with the court that the executing officers exceeded the reach of

the warrant when they entered 351 Noble Avenue.

The state next claims that "[a] technically wrong address does not invalidate a warrant if it otherwise describes the premises with sufficient particularity so that the police can ascertain and identify the place to be searched." (Internal quotation marks omitted.) In support of this claim, the state relies on a number of cases in which courts have held that an error in the description of the place to be searched does not necessarily invalidate the warrant.[13] In contrast, Lyons claims in his brief that "there is no legal or factual merit to the state's claim that government officials committed an excusable mistake when they searched not at the address authorized by the magistrate but at the house next door." Likewise, the other defendants similarly challenge the state's claim that "the officers were justified in searching a premises other than that clearly identified in the warrant." (Emphasis omitted.) We agree with the defendants and conclude that the cases on which the state relies are factually distinguishable from the present case.

The state is correct that "[a]n erroneous description in the warrant . . . does not necessarily invalidate a warrant and subsequent search." *United States* v. *Owens*, 848 F.2d 462, 463 (4th Cir. 1988). The United States Supreme Court has recognized "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Maryland* v. *Garrison*, supra, 480 U.S. 87. "Courts of Appeals have rejected [f]ourth [a]mendment challenges to warrants that contain partial misdescriptions of the place to be searched so long as the officer executing the warrant could ascertain and identify the target of the search with no reasonable probability of searching another premises in error . . . . *Warrants have been upheld despite technical errors, such as an incorrect street address, when the possibility of actual error is eliminated by other information, whether it be a detailed physical description in the warrant itself, supplemental information from an appended affidavit, or knowledge of the executing agent derived from personal surveillance of the location to be searched.*" (Citation omitted; emphasis altered; internal quotation marks omitted.) *Velardi* v. *Walsh*, 40 F.3d 569, 576 (2d Cir. 1994); see also *United States* v. *Waker*, 534 F.3d 168, 171 (2d Cir. 2008) ("[M]inor errors in an affidavit are not cause for invalidating the warrant that it supports. . . . [A]ffidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. . . . It follows that courts should not invalidate [a] warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner." (Citations omitted; internal quotation marks omitted.)); *United States* v. *Lora-Solano*, 330 F.3d 1288, 1293 (10th Cir. 2003) ("[a] technically

wrong address does not invalidate a warrant if it otherwise describes the premises with sufficient particularity so that the police can ascertain and identify the place to be searched"), cert. denied, 541 U.S. 940, 124 S. Ct. 1658, 158 L. Ed. 2d 362 (2004); *Youngs* v. *Fusaro*, 179 F. Supp. 3d 198, 204–205 (D. Conn. 2016) (technical error such as incorrect street address does not necessarily invalidate warrant when possibility of actual error can be eliminated by other information such as detailed description of property in warrant itself).

A number of cases have recognized that a minor error in the description of a premises, including an incorrect address or wrong house number on the warrant, does not necessarily invalidate the warrant. For example, in *United States* v. *Valentine*, 984 F.2d 906, 909 (8th Cir.), cert. denied, 510 U.S. 828, 114 S. Ct. 93, 126 L. Ed. 2d 60 (1993), the warrant incorrectly identified the number of the building to be searched as "3048 Thomas," rather than its actual number of "3050 Thomas." The United States Court of Appeals for the Eighth Circuit determined that, because the warrant described the target of the search in detail by providing a description of the building to be searched and because the search was confined to that building, the technical error in the particularity of the address in the warrant was insufficient to invalidate the warrant. Id. Similarly, in *United States* v. *Bonner*, 808 F.2d 864, 865 (1st Cir. 1986), cert. denied, 481 U.S. 1006, 107 S. Ct. 1632, 95 L. Ed. 2d 205 (1987), the warrant contained a detailed description of the premises to be searched but omitted the exact address or house number. The United States Court of Appeals for the First Circuit upheld the validity of the warrant, concluding that, because the case agent who executed the warrant previously had conducted surveillance of the premises on at least ten prior occasions and because the residence was described in the warrant with sufficient particularity, "there was no reasonable probability that another premises might be mistakenly searched," despite the "minor, technical omission" in the warrant. Id., 866–67.

In *United States* v. *Burke*, 784 F.2d 1090, 1092 (11th Cir.), cert. denied, 476 U.S. 1174, 106 S. Ct. 2901, 90 L. Ed. 2d 987 (1986), the warrant incorrectly stated the address for an apartment in a housing project as "38 Throop Street," apartment 840, when in fact the correct address was 48 Troup Street, apartment 840, in Atlanta, Georgia. The United States Court of Appeals for the Eleventh Circuit, nevertheless, found that the warrant was valid and satisfied the particularity requirements of the fourth amendment. Id., 1093. In making that determination, the court first explained that there is no such road as "Throop Street" in Atlanta and that the only street with a similar name was Troup Street. Id., 1092. The court further stated: "The search warrant contained a detailed physical description of the building, minimizing the possibility that an apartment in any building

other than the correct one would be searched. See *United States* v. *Figueroa*, 720 F.2d 1239, 1243 n.5 (11th Cir. 1983) (mistaken address 'inconsequential in light of a clear description of the name of the building and its physical appearance'). In addition, the warrant correctly named the apartment number, and there was only one apartment with the number '840' in the . . . [h]ousing [p]roject in which [the] appellee resided." *United States* v. *Burke*, supra, 1092.

As the court in *Burke* explained: "In evaluating the effect of a wrong address on the sufficiency of a warrant, this [c]ourt has also taken into account *the knowledge of the officer executing the warrant, even where such knowledge was not reflected in the warrant or in the affidavit supporting the warrant. . . .* In the present case, Agent [John] Benesh knew precisely which premises were to be searched. Although Benesh did not himself execute the warrant, he pointed out the correct apartment to the executing officer . . . . The actions of Benesh and [the executing officer] insured that there was no possibility the wrong premises would be searched." (Citations omitted; emphasis added.) Id., 1092–93.

The preceding cases make clear that when a warrant has been found to be valid, despite a technical error in the address stated, it is because the warrant itself contained a detailed description of the premises that enabled the executing officers to identify the place to be searched or because there was evidence that at least one of the executing officers had prior knowledge related to the premises searched, such that there was no possibility that the wrong premises would be searched. Those factors do not exist in the present case. Here, the warrant simply contained the address of the place to be searched—349 Noble Avenue—with no physical description of the property itself, which was identified at trial as a duplex with two separate addresses, including two driveways, parking areas, walkways, porches, mailboxes, front doors and utility meters. As the trial court determined, the description in the warrant was clear and unambiguous and left "no room for interpretation"; the police were authorized by the warrant to search 349 Noble Avenue, not the property located at 351 Noble Avenue. There was nothing on the face of the warrant that eliminated the possibility that another premises might be mistakenly searched.

Moreover, the state's claim that the search of the wrong address was valid because "Slaiby was part of the surveillance team and had surveilled the property approximately three times" and because he "took part in the presearch briefing" is unavailing. It is clear from the transcript of Slaiby's testimony that he was not familiar with the building searched, he never saw a copy of the warrant, the presearch briefing did not include a discussion of the location to be searched, he

previously had conducted surveillance only of the area, "[n]ot of the house itself," and he was not part of the preparation of the warrant, nor did he know what information was contained in the warrant. In rejecting the state's assertion, the court found that in the cases in which warrants have been upheld despite a lack of particularity, "the same law enforcement officers conducted the investigation, *prepared* the warrant application and led or participated in the execution, which was sufficient to prevent general rummaging, the evil against which the particularity clause of the fourth amendment is designed to protect. In this case, the only evidence in the record is that . . . Slaiby never conducted surveillance of the house at 349–351 Noble Avenue; there is no evidence about any other executing officer." (Emphasis in original.) We agree with the court that the factors that may justify a search where there is an error in the warrant are simply not present here.

We agree with the trial court that when the police searched 351 Noble Avenue rather than 349 Noble Avenue, they searched a residence that was not authorized by the warrant. Therefore, the search of 351 Noble Avenue was a warrantless search that was per se unreasonable and violated the fourth amendment.[14] See *State* v. *Blades*, 225 Conn. 609, 617, 626 A.2d 273 (1993). Accordingly, the court properly granted the defendants' motions to suppress the evidence seized as a result of that warrantless search.

The judgments are affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] Pursuant to General Statutes § 54-96, the state requested, and the trial court granted, permission to appeal from the judgments of dismissal.

[2] The state has not challenged the standing of the remaining defendants to file and pursue motions to suppress the search of the premises.

[3] By way of information in docket number CR-17-0294700-S, Lyons was charged with theft of a firearm in violation of General Statutes § 53a-212 and possession of a controlled substance in violation of General Statutes § 21a-279 (a) (1). In docket number CR-17-0294868-S, David Gordon was charged by way of information with sale of a controlled substance in violation of General Statutes § 21a-277 (b), operation of a drug factory in violation of § 21a-277 (c), possession of a controlled substance in violation of § 21a-279 (a) (1), negligent storage of a firearm in violation of General Statutes § 53a-217a, possession of a controlled substance within 1500 feet of a school in violation of General Statutes § 21a-278a (b), and possession of drug paraphernalia within 1500 feet of a school in violation of General Statutes § 21a-267 (c). In docket number CR-17-0294869-S, Prince Gordon was charged by way of information with sale of a controlled substance in violation of § 21a-277 (b), possession of a controlled substance in violation of § 21a-279 (a) (1), and possession of drug paraphernalia in violation of § 21a-267 (a). Finally, in docket number CR-17-294870-S, Greene-Walters was charged by way of information with sale of a controlled substance in violation of § 21a-277 (b) and possession of a controlled substance in violation of § 21a-279 (a) (1).

[4] On January 6, 2020, this court granted Lyons' motion for permission to file a separate appellate brief and appendix.

[5] The state objected to this testimony on hearsay grounds, claiming that it could be admitted only through the testimony of Lyons. The court overruled the objection.

[6] The state's failure to brief the issue of harm is particularly damning to its evidentiary claim in this case because there was sufficient other evidence to support the court's conclusion that Lyons had standing to contest the

search of the third floor bedroom. Specifically, Slaiby testified that the third floor room was a bedroom with a door and that inside the room he found personal items such as a passport and an identification card, as well as men's clothing, including a pair of pants that contained a wallet with an identification card. Although one of the identification cards found contained the name "Sean Brown," it had a photograph of Lyons on it. Slaiby also found other identifications that contained Lyons' name and photograph. Moreover, Slaiby responded "no" when asked whether he found identification cards for either Sean Brown or Lyons while searching other portions of the building, and he stated that he did not find identification for anyone else in the third floor bedroom. He also indicated that, when searching the third floor bedroom, a "Metro PCS mail or receipt" was found with the name "Sean Brown" on it, and that there was a sign on the wall in that bedroom that stated, "I do not give consent to search." When Slaiby was asked whether he encountered Lyons on the third floor, he responded in the negative, stating that Lyons "was already on the first floor from the SWAT team escorting him down," to which the state did not object. Finally, when Lyons was arrested, he was wearing a bathrobe and slippers, which supported a conclusion that, at a minimum, he had slept overnight at the 351 Noble Avenue residence the night before the search. Given that, at the time Slaiby entered 351 Noble Avenue, all of the residents had been gathered downstairs near a first floor bathroom and that men's clothing with a wallet and identification card, along with other identifications bearing either Lyons' name or photograph or both were found in the third floor bedroom, it logically follows that, at the time of the search, Lyons was sleeping in that bedroom as either a resident or, at a minimum, an overnight guest. This evidence, separate and apart from Slaiby's statements as to what he was told by Lyons and the SWAT team, sufficiently supports the court's factual finding that Lyons at least spent the night sleeping in the third floor bedroom at 351 Noble Avenue and the court's conclusion that Lyons had an expectation of privacy in the contents of that bedroom that society would consider reasonable.

[7] The investigation report was referenced at the hearing on the motions to suppress when the prosecutor asked Slaiby if he recalled "completing an investigation report, a police report, of [his] tasks during the course of this search and seizure warrant," to which Slaiby responded, "yes."

[8] This inventory was also referenced at the hearing during direct examination of Slaiby by Lyons' counsel, Attorney Mary Haselkamp, when the following colloquy transpired:

"[Attorney Haselkamp]: And in terms of when you arrested . . . Lyons, do you remember what he was wearing?

"[Slaiby]: I do not.

"[Attorney Haselkamp]: And when you arrest somebody, you take an inventory of their clothing. Is that correct?

"[Slaiby]: Yes.

"[Attorney Haselkamp]: And you were part of the—you in fact arrested . . . Lyons.

"[Slaiby]: Yes.

"[Attorney Haselkamp]: And part of that inventory is the clothes they wore.

"[Slaiby]: I'm sorry.

"[Attorney Haselkamp]: Part of the inventory would be clothes that they had on their person, correct?

"[Slaiby]: It depends if we're taking the clothes away from them—

"[Attorney Haselkamp]: Okay.

"[Slaiby]: —to be stored in a locker.

"[Attorney Haselkamp]: So, if you had taken clothes from him you would have put that down in an inventory.

"[Slaiby]: Yes.

"[Attorney Haselkamp]: And do you remember what clothes you took from him?

"[Slaiby]: I do not.

"[Attorney Haselkamp]: Would it refresh your recollection to look at the inventory sheet?

"[Slaiby]: It might, yes.

"[The Prosecutor]: This again, I've had occasion to view this. This should be marked [as an] exhibit for identification. This would be the third one, Your Honor, please.

"The Court: Refresh his recollection as to the clothes seized from . . . Lyons.

"[Attorney Haselkamp]: Yes, Your Honor.

"[The Prosecutor]: I believe—

"The Court: He's refreshing his recollection and has your recollection been refreshed?

"[Slaiby]: Yes.

"The Court: Are you able to testify independent of the document? Yes, counsel.

"[Attorney Haselkamp]: Thank you, Your Honor. . . . [Mr. Slaiby], [d]o you remember what items of clothing you seized from . . . Lyons?

"[The Prosecutor]: I have an objection. This is clothing that this witness took from . . . Lyons. Is that the question?

"[Attorney Haselkamp]: Yes.

"[The Prosecutor]: And I have an objection if he can answer that. I think that the document—this is a different document than what's been represented. This is after the booking.

"[Attorney Haselkamp]: That's correct.

"[The Prosecutor]: If he participated in booking that's fine but we haven't gotten to that point yet. I don't think he [can] refresh his recollection to a document he has not seen until this point. He was not part of that particular activity and he had no original memory.

"The Court: Any document can be used to refresh recollection. He indicates the document refreshed his recollection.

"[The Prosecutor]: I agree.

"The Court: The objection is overruled. You may answer the question.

"[The Prosecutor]: But if he's relying upon—my objection is he's relying upon what is in the document—

"The Court: I'm [not] relying upon anything other than [him] telling the court that his recollection is refreshed.

"[The Prosecutor]: Thank you, Your Honor.

"The Court: That's all the reliance we need. Go right ahead.

"[Slaiby]: Bathrobe and slippers."

[9] On the basis of our review of the record, the document was never actually marked for identification.

[10] The trial court, in ruling on the motions to suppress, had before it the full, unredacted and unsealed affidavit.

[11] In the present case, the state claims that the entry into 351 Noble Avenue by the police was made pursuant to a valid warrant and does not assert the applicability of any exceptions to the warrant requirement. See footnote 14 of this opinion.

[12] We note that this claim is belied by the fact that the affidavit in support of the warrant described the property as a multifamily residence.

[13] In its brief, the state relies on certain Connecticut case law for the standard this court must apply in determining the validity of the warrant. See *State* v. *Zarick*, 227 Conn. 207, 224, 630 A.2d 565 (court should apply "common sense and may draw normal inferences from the facts alleged in the affidavit"), cert. denied, 510 U.S. 1025, 114 S. Ct. 637, 126 L. Ed. 2d 595 (1993); *State* v. *Johnson*, 219 Conn. 557, 565, 594 A.2d 933 (1991) (court should "afford deference to the magistrate's determination"); *State* v. *Barton*, 219 Conn. 529, 545, 594 A.2d 917 (1991) ("reviewing court should not invalidate the warrant by application of rigid analytical categories"). It then argues that those cases "stand for the proposition that the reviewing court must give deference to a signed warrant when determining that there is a proper finding of *probable cause*." (Emphasis added.) Those cases, however, concern the issue of whether there was probable cause for the issuance of the warrants, and the standards set forth therein apply to an appellate court's review of a finding of probable cause. The issue of whether there was probable cause for the issuance of the warrant to search 349 Noble Avenue is not before this court. Instead, we must determine whether the trial court properly granted the motions to suppress and determined that the search of 351 Noble Avenue constituted a warrantless search that violated the fourth amendment to the United States constitution. Accordingly, the state's reliance on, and arguments related to, case law concerning probable cause to support the issuance of a search warrant is misplaced. We also disagree with the state's reliance on *State* v. *Buddhu*, 264 Conn. 449, 467, 825 A.2d 48 (2003), cert. denied, 541 U.S. 1030, 124 S. Ct. 2106, 158 L. Ed. 2d 712 (2004), in support of its claim that an ambiguity existed in the warrant. *Buddhu* involved the issue of whether the officers had a duty to disclose to the judge issuing the warrant that the residence to be searched was located in a multiunit building. Id., 470. The factual circumstances of *Buddhu* are distinguishable from those in the present case, in which a warrant was issued to search a particular residence, and the police searched a residence

different from the one identified in the warrant.

[14] The trial court found that "[t]he state relie[d] entirely on the warrant as legal authorization for the search" and did "not claim any exception to the warrant requirement." On appeal, the state also has not argued that a valid exception to the warrant requirement applies, and it stated at oral argument before this court that it was not arguing for the application of the good faith exception. We, therefore, do not address whether the search of 351 Noble Avenue should, nevertheless, be held valid pursuant to, inter alia, the good faith or exigent circumstances exceptions to the warrant requirement.

———————————————